FRANCIS W. GAGNON vs. JOAN G. COOMBS,
individually and as trustee, & another.[1]

No. 94-P-856.

Franklin. February 8, 1995. - August 23, 1995.

Present: DREBEN, GILLERMAN, & LAURENCE, JJ.

*Agency*, Termination, Agent's duty of fidelity. *Fiduciary*. *Real Property*,
Sale. *Trust*, Irrevocable trust, Trustee's authority.

An agent under a power of attorney had constructive, if not actual, notice
that the principal had terminated the agent's authority with respect to
certain real property by the agent's knowledge of the principal's having
entered an agreement to sell the property to a third party: the convey-
ance was therefore void, and the agent, who had conveyed the property
to a trust in response to learning of the agreement, was to reconvey the
property to the principal. [151-153]
An agent under a power of attorney violated her fiduciary duty of loyalty
to her principal by conveying the principal's property to herself as trus-
tee of an irrevocable trust [154-155], by refusing to obey the principal's
direction that she reconvey the property to the principal [155-156], by
failing to inform the principal of all relevant facts with respect to the
transfer of the property [156-157], and by her self-dealing with respect
to the conveyance [157-159]: the conveyance was therefore revocable
and the agent was to reconvey the property to the principal.

CIVIL ACTION commenced in the Superior Court Depart-
ment on January 15, 1992.

The case was heard by *Richard F. Connon*, J.

*Michael J. Rye* for the plaintiff.

*Michael D. Parker* for the defendants.

LAURENCE, J. An agent acting pursuant to a "durable,"[2]
but revocable, power of attorney conveyed the principal's real
property, which was subject to the power, to herself as

---

[1]Jeanne M. Rowe, trustee, with Joan G. Coombs, of the Francis W.
Gagnon Trust.

[2]See G. L. c. 201B, § 1. A "durable" power of attorney provides that the
agent's power will not be affected by the subsequent disability or incapac-

trustee of a trust that she had created. The trust was not only irrevocable, but also gave the agent a beneficial interest in the corpus, which consisted entirely of that real property. A judge of the Superior Court found nothing legally amiss about this transaction, even though the agent was aware that the principal had, prior to the creation of the trust, himself contracted to sell the real property to a third party. After a bench trial, the judge entered judgment for the agent on the principal's suit to set aside the agent's conveyance. We conclude that the principal should have prevailed. The agent's authority to deal with the property had been effectively revoked by the principal's precedent purchase and sale contract. Reversal is also in order because the transaction violated basic agency principles.

1. *Background.* The relevant facts are not in dispute. On November 27, 1990, eighty-five year old Francis W. Gagnon (Gagnon) and his wife executed durable powers of attorney, each naming their elder daughter, Joan Coombs (Joan), their attorney in fact. There was no immediate need or purpose for the power of attorney. It was executed in recognition of the two principals' advanced years and general deterioration of health associated with old age. At the time, Gagnon and his wife lived in a house on the property at issue, a 184-acre "farm property" in Shelburne.[3] The Shelburne property was not a functioning farm and produced no income. Gagnon also

---

ity of the principal. Those events would terminate the agency under common law principles.

[3]Joan lived in Amherst, approximately twenty miles from Shelburne. Gagnon's other daughter, Jeanne Rowe (Jeanne), lived in Arizona. His only son, Francis A. Gagnon (Frank), resided in a trailer on a remote part of the Shelburne property. Jeanne and Frank were not aware of Joan's power of attorney until sometime after its execution. The trial testimony indicated considerable disharmony, if not hostility, between Frank and the two sisters, with an exchange of recriminations regarding the proper care of their parents and alleged misuse of their assets, as well as mutual intimations of undue influence on Gagnon in connection with the power of attorney and its revocation. The judge found no undue influence on anyone's part and concluded that Gagnon had at all relevant times acted competently and with sufficient understanding in connection with the several transactions at issue in this case.

owned a smaller parcel of real estate in Hillsborough, New Hampshire.

Under the power of attorney, Joan was broadly empowered "to act in and concerning all of my affairs as fully and effectually as I might do if personally present . . . ." Her specific powers included the authority "to sell any of my real estate and to [execute any documents] . . . necessary in order to carry out the proper sale or transfer of real estate," and "to add property to or withdraw property from any trust of which I am the grantor or beneficiary." The document did not, however, contain any provision authorizing the agent to acquire interests adverse to those of the principal or to seek or derive personal advantage, profit, or benefit from the agency or from any transactions undertaken pursuant thereto. The instrument was also silent as to any compensation for the attorney in fact. Gagnon did not discuss with Joan the handling of any particular property or financial matter before or at the time he signed the power of attorney. Its execution was simply a precaution in the event Gagnon became unable to attend to his affairs personally.[4] The document was shortly thereafter recorded in the Franklin County registry of deeds. See G. L. c. 183, § 5.

In February, 1991, Gagnon's wife had to enter a nursing home. While she was being admitted, Gagnon's son Frank learned of Joan's power of attorney for the first time. Following discussions between Gagnon and Frank (who had moved from his trailer into the Shelburne house because his father was now alone), Gagnon decided to revoke the power of attorney he had given to Joan. He did so in a document executed on February 28, 1991, with the assistance of a Greenfield lawyer whom Frank had found for him. He did not, however, send a copy of the revocation to Joan or anyone else, nor did he or anyone else orally advise Joan of the revocation, at least not prior to the activities of Joan that precipi-

---

[4]The only information that the attorney who prepared the power of attorney had was provided to him by Joan. The attorney did not discuss the document's contents with Gagnon except to ask whether Gagnon "fully understood it."

tated the instant litigation. The revocation was not recorded in the Franklin County registry of deeds until a year after those events.

In April, 1991, Gagnon was hospitalized, and his wife died soon thereafter. In light of these developments, Joan consulted the lawyer who had drafted the power of attorney, for probate and estate planning advice. The lawyer prepared a so-called "Medicaid Qualifying Trust" that provided Gagnon, as beneficiary, with income for life and divided all of his property at his death among his three children, who were named as trustees. The trust draft (which is not part of the record on appeal) was sent to Gagnon, who had been discharged from the hospital, in May, 1991. Gagnon never responded to the draft, never discussed it with the lawyer or his children, and never signed it.

Following his discharge, Gagnon improved in health and by the fall of 1991 had resumed interest, which he had first manifested in December, 1990, in selling the Shelburne property. During the earlier part of 1991, Gagnon had authorized Joan's husband, Allyn Coombs (Allyn), a seasoned real estate investor, to investigate the possibility of such a sale. In May, 1991, Allyn had identified one Camille Cosby, whom he had previously helped purchase other land in the area, as a potential buyer. When Cosby offered $600,000 for the property, Gagnon responded that it was worth $1,000,000. Allyn obtained an appraisal establishing a fair market value of $760,000 as of July, 1991.

At that point, Gagnon told Allyn to "talk to Frank" regarding future negotiations with Cosby as to the Shelburne property. Frank authorized a sale for the price of $750,000. Further negotiations (without Allyn's involvement) ensued in the fall of 1991. They culminated on December 5, 1991, in the signing by Gagnon and Cosby of a purchase and sale agreement for the Shelburne property at a price of $750,000. Under the agreement, Cosby placed an escrow deposit of $75,000 with Gagnon's attorney, to be paid to Gagnon and applied to the balance of the purchase price at a closing that the agreement specified would be held on January 21, 1992.

Gagnon promised in the agreement to convey good and clear title and to deliver a warranty deed for the premises at the closing. One week later, on December 12, 1991, Gagnon executed a deed conveying his Hillsborough, New Hampshire, property to Frank.

At some time after December 12, 1991, but before December 26, 1991, Gagnon told Joan about his having executed the purchase and sale agreement with Cosby. He also revealed to her that he was moving to Hillsborough, New Hampshire, to live with Frank. What ensued was the result of Joan's learning of these developments. On December 26, 1991, without discussing it with Gagnon, Joan created and executed the "Francis W. Gagnon Trust," with a stated corpus of $1,000.00 (although no money was ever actually placed in the trust). She was both the "[d]onor" and the sole trustee of the trust, with Gagnon designated as the "[p]rimary [b]eneficiary." The trust was made irrevocable, with one exception: Joan reserved to herself as settlor the right at any time to amend or revoke any provision relating to the powers and duties of the trustee and the appointment or removal of additional or successor trustees. Joan expressly empowered herself as trustee to deal with both real and personal trust property "whether or not personally interested in the exercise of any such power and without approval of any Court."

As primary beneficiary, Gagnon was entitled to the net income of the trust for life (although the trust never saw any income, its sole asset being the unproductive Shelburne property). Joan, however, as trustee reserved sole discretion not only as to when such income should be paid, but also whether it should be paid directly to Gagnon or rather "applied" for his benefit. Additionally, Joan as trustee could alone determine what should be deemed income and what should be credited to principal, "notwithstanding any determination by the Courts." Any income not paid to Gagnon was to be added to principal of the trust, which at Gagnon's death was to be divided into equal shares among Joan, Jeanne, and Frank. Gagnon had no right to call upon the

principal during his lifetime; rather, Joan as trustee had the "sole discretion" to apply so much of the principal for his support, maintenance, and health as she deemed "advisable."

On December 26, 1991, simultaneously with the creation of the Francis W. Gagnon Trust, Joan conveyed the Shelburne property, purportedly pursuant to the terms of the November 27, 1990, power of attorney, to herself as trustee of that trust. The conveyance was without consideration and by quitclaim deed, recorded in the Franklin County registry the next day. Joan also recorded with the deed an affidavit, which stated that at the time of the execution of the deed she did not have "actual knowledge" of the termination of her power of attorney by revocation, death, disability, or incapacity of the principal.[5]

By letter dated December 26, 1991, Joan notified Frank of her actions. She asserted that they had been taken for "the preservation of our father's assets and estate" and to make the sale of the Shelburne property "easier" by eliminating buyer "concern" about Gagnon's "competence" and "ability to fully understand the nature and extent of the transaction."[6] Joan proposed to make Frank a cotrustee, along with

---

[5]This affidavit was not included in the record on appeal. The judge's finding regarding the affidavit indicates that it stated that at the time of the execution of the deed, Joan did not have actual knowledge of the termination of the durable power of attorney by revocation, death, disability, or incapacity of the principal. It thus closely tracked the language of G. L. c. 201B, § 5, inserted by St. 1981, c. 276, § 2, which states, in pertinent part:

> "As to acts undertaken in good faith reliance thereon, an affidavit executed by the attorney in fact under a power of attorney, durable or otherwise, stating that he did not have, at the time of exercise of the power, actual knowledge of the termination of the power by revocation or of the death, disability or incapacity of the principal shall be conclusive proof of the nonrevocation or nontermination of the power at that time. If the exercise of the power of attorney requires execution and delivery of any instrument that is recordable, such affidavit when authenticated for record shall be likewise recordable. . . ."

[6]The record contains nothing to suggest that Cosby or any other potential buyer had ever expressed any such concern. The judge found, based upon a psychiatrist's expert testimony, that Gagnon was competent and understood the business relationships he entered or engaged in during the

herself and Jeanne. Frank rejected this offer. Jeanne may have received and accepted a similar offer.[7]

In early January, 1992, after he had learned of her conveyance to the trust, Gagnon demanded (through his lawyer) that Joan return the Shelburne property to him. (The attorney's letter to Joan also informed her that Gagnon had revoked her power of attorney.) When she refused, Gagnon immediately filed the instant action seeking to set aside the conveyance. After a three-day trial in May, 1993, the judge ordered judgment for the defendants upon findings of fact and rulings of law that upheld Joan's authority under the power of attorney to convey the Shelburne property to the trust.

The judge's disposition rested upon his conclusion that Joan had neither actual nor constructive notice "that her authority to act on [Gagnon's] behalf had been terminated prior to December 26, 1991." The judge further ruled that Joan's affidavit denying "actual knowledge" of any revocation of her agency, along with the December 26, 1991, letter to Frank, "provide[d] conclusive proof that, as of December 26, 1991, [Joan] did not reasonably believe that her power of attorney had been terminated"; and that Gagnon's execution

---

relevant time period. On cross-examination Joan admitted that she had set up the trust and conveyed the Shelburne property to it upon learning of, and in direct response to, Gagnon's having contracted to sell the property. See also note 8, *infra.*

[7]The "Frank W. Gagnon Trust" in the record appendix specifies and was signed by only one trustee, Joan G. Coombs. Documents entitled "Acceptance of Trust" for the appointment of Frank and Jeanne as trustees along with Joan are unexecuted, unwitnessed, and unnotarized. The December 26, 1991, quitclaim deed for the Shelburne property identifies only Joan G. Coombs as trustee of the trust. The naming of Jeanne as a party defendant in this litigation in her capacity as trustee and her designation as such in the judge's opinion suggest that she may have agreed to become a cotrustee with Joan prior to the commencement of this litigation on January 15, 1992. (The pleadings are not, however, contained in the record on appeal.) No separate allegations or claims against Jeanne appear to have ever been advanced. Gagnon's appellate prayer for relief — declarations that the December 26, 1991, conveyance is null and void because of Joan's misconduct as agent and that Gagnon continues to own the Shelburne property and an order that Joan pay his costs and legal fees — is indicative of Jeanne's marginal, essentially immaterial role in the case.

of the purchase and sale agreement "was not an act in derogation of the power of attorney such that [Joan] had constructive notice that her authority to act on Gagnon's behalf had been revoked prior to the disputed conveyance . . . ." We reverse, because Joan should have realized that her authority to dispose of the Shelburne property had been effectively revoked when she learned Gagnon had contracted to sell it. Even if there was no revocation, however, Joan's conduct was inconsistent with well-established doctrines of the law of agency that require her to undo the challenged transaction.

2. *Joan's authority to act regarding the Shelburne property was revoked by Gagnon's purchase and sale agreement.* The judge's conclusion as to the effect of Gagnon's purchase and sale agreement on Joan's authority cannot stand. It is subverted by Joan's knowledge of that agreement prior to the December 26, 1991, conveyance and her concession that she undertook the trust arrangement in response to learning of the agreement.

A principal may manifest his termination of his agent's authority, either in whole or in part, by conduct that is inconsistent with its continuance. Examples of such implicitly countermanding conduct are "where [the principal] retakes possession of goods which he had authorized the agent to sell, or where he sells or disposes of the subject matter or of his interest therein, or voluntarily causes its loss or destruction." Restatement (Second) of Agency § 119 comment b & illustration 4 (1958). See *Flynn* v. *Butler,* 189 Mass. 377, 388-390 (1905) (principal impliedly revoked power of attorney of agent authorized to pursue legal action by commencing action on her own behalf). "[A]ny form of manifestation made known to the [agent] is effective" if, "reasonably interpreted, [it] indicates that the principal no longer consents to have the agent act for him . . . ." Restatement (Second) of Agency § 119 comment a.

"An agent is authorized to do, and to do only, what it is reasonable for him to infer that the principal desires him to do in the light of the principal's manifestations and the facts

as [the agent] knows or should know them at the time he acts." *Id.* § 33. "Whatever the original agreement or authority may have been," if the agent "knows facts which should lead him to believe that his authority is restricted or terminated, he has a duty to act only within the limits of the situation as it is currently known to him." *Id.* § 33 comment a. The "will [of the principal] may change . . . . Whatever it is at any given time, if the agent has reason to know it, his duty is not to act contrary to it. The fact that in changing his mind the principal is violating his contract with the agent does not diminish the agent's duty of obedience to it." *Id.* § 33 comment b. See also *id.* § 108(1) & comments b, c, & f.

Finally, an "agent has notice that authority to do an act has terminated or is suspended if he knows, has reason to know, should know, or has been given a notification of the occurrence of an event from which the inference reasonably would be drawn . . . by the agent, that the principal does not consent to the act or would not if he knew the facts . . . ." *Id.* § 134.

These objective principles were activated by Joan's knowledge prior to December 26, 1991, of Gagnon's December 5, 1991, purchase and sale agreement. Joan was thereby on notice, see *id.* § 9(1) & (2), and should have known that (a) Gagnon desired to sell the Shelburne property himself to Cosby no later than January 22, 1992, and (b) Gagnon would not have consented either to losing the opportunity to complete that sale or to any conveyance of the property that would deprive him of all control over the property and the right to immediate enjoyment of the proceeds from its sale. His prompt demand for return of the property and swift litigation upon Joan's refusal constitute ample evidence of his contemporaneous wishes. Indeed, Joan was not just passively on notice of Gagnon's desires with respect to the Shelburne property: her trust arrangement was deliberately effected to

frustrate those desires, by preventing the consummation of Gagnon's purchase and sale contract.[8]

Joan had engaged in a number of real estate transactions over the years with her broker-investor husband, Allyn, and was trustee of a realty trust. She must or should have realized that by conveying title to the Shelburne property from Gagnon to herself as trustee, she was preventing Gagnon from performing his promises under the purchase and sale agreement and thereby exposing him to a suit for specific performance and possibly damages (see *infra*) — undesirable consequences that she reasonably should have known Gagnon (and any seller of land under favorable contract) would want to avoid.

In these circumstances, Joan must be deemed to have had, prior to her conveyance of the Shelburne property to herself as trustee, constructive (if not actual) notice that Gagnon had effectively terminated her authority with respect to that property. Her affidavit disclaiming "actual knowledge" of the termination or revocation of her power of attorney was irrelevant to the issue of constructive notice. The judge's determination that the affidavit was "conclusive proof" that Joan remained empowered to convey the Shelburne property was erroneous[9] in light of the undisputed facts, as well as applicable agency principles.

---

[8]It is evident from her testimony that Joan was motivated by a concern that the proceeds of the sale would be "in peril" because Frank, whom she accused of misusing Gagnon's assets and unduly influencing Gagnon's actions, would somehow obtain them "for his own benefit." See also note 6, *supra*.

[9]Gagnon is correct in pointing out that the G. L. c. 201B, § 5, affidavit does not support Joan's position, since such a document is intended as protection for third parties dealing with an agent who rely thereon, not as a self-serving mechanism to validate the acts of an attorney in fact who is chargeable with constructive notice of the pro tanto termination of her authority. See comment to Uniform Durable Power of Attorney Act § 5, 8 U.L.A. 327 (Master ed. 1979) (on which G. L. c. 201B, § 5, was based). See also Uniform Probate Code, prefatory note to part 5 of Art. V, 8 U.L.A. 511 (Master ed. 1975), and comments to §§ 5-502, 5-504, & 5-505, 8 U.L.A. 514, 516, 517 (Master ed. 1975). The appellees' brief prudently abandoned reliance on the G. L. c. 201B, § 5, affidavit as a ground for affirmance.

3. *Joan violated the basic fiduciary duties of an agent.*
Gagnon's effective revocation of the power of attorney with
respect to the Shelburne property is not the only reason for
reversal. The power of attorney created (as Joan acknowl-
edges) a traditional principal-agent relationship. That rela-
tionship has one supreme characteristic: as his agent, Joan
stood in a *fiduciary* relation to Gagnon with respect to all
matters within the scope of the agency. Restatement (Sec-
ond) of Agency §§ 1, 13, 375.

a. *Joan violated her fiduciary duty of loyalty by impair-
ing Gagnon's rights with respect to the Shelburne property.*
Like all fiduciaries, Joan owed Gagnon the duty of utmost
good faith and absolute loyalty.[10] The quintessential mandate
of that primal fiduciary duty obligated Joan to act, in the
absence (as here) of language in the power of attorney to the
contrary, *solely* in and to further Gagnon's interest, even at
the expense of her own interest in matters connected with the
agency. See *Spritz* v. *Brockton Sav. Bank,* 305 Mass. 170,
172 (1940); *Jerlyn Yacht Sales, Inc.* v. *Wayne R. Roman
Yacht Brokerage,* 950 F.2d 60, 66 (1st Cir. 1991); Restate-
ment (Second) of Agency §§ 39, 387, 393.

Joan's conveyance of the Shelburne property to herself as
trustee of an irrevocable trust would have injured Gagnon's
interests in several respects, were it upheld.[11] Gagnon was
divested of the power to revoke the agency as to the prop-
erty.[12] He was prevented from ever regaining title to or con-

---

[10]See *Dolbeare* v. *Bowser,* 254 Mass. 57, 61-62 (1925) (guardian and
ward); *Minnehan* v. *Minnehan,* 336 Mass. 668, 671 (1958) (conservator
and ward); *McClintock* v. *Scahill,* 403 Mass. 397, 400 (1988) (trustee and
beneficiary); *Meehan* v. *Shaughnessy,* 404 Mass. 419, 433-434 (1989)
(partners); *Blank* v. *Chelmsford OB/GYN, P.C.,* 420 Mass. 404, 408
(1995) (close corporation stockholders).

[11]The fact that Joan was expressly authorized by the power of attorney
to place Gagnon's property in a trust of which he was beneficiary is irrele-
vant if the authorized act was done for an improper purpose that consti-
tuted a breach of her duty of loyalty. See Restatement (Second) of Agency
§ 39, § 381 & comment a, § 385, § 387 & comment a, § 389 & comment
a, § 393 & comment b.

[12]An agency can always (with exceptions not here relevant) be termi-
nated at the will of the principal. A trust, on the other hand, can only be
terminated in accordance with its terms, regardless of the will of the set-

trol over the property.[13] He was deprived of enjoyment of the proceeds of the sale for which he had contracted.[14] He was precluded from conveying the property to successors of his choosing through testamentary disposition. See *Dolbeare* v. *Bowser*, 254 Mass. 57, 61 (1925) (fiduciary should not be concerned, let alone interfere, with succession to property subject to his power). Finally, he was exposed to suit by Cosby and to liability for breach of his purchase and sale agreement, which was specifically enforceable in equity, and of his warranties made therein. See *Flynn* v. *Wallace*, 359 Mass. 711, 717, 720 (1971); *Yiakas* v. *Savoy*, 26 Mass. App. Ct. 310, 313 (1988). See also *Limpus* v. *Armstrong*, 3 Mass. App. Ct. 19, 22, 24 (1975).

b. *Joan violated her fiduciary duty of loyalty by refusing to honor Gagnon's request for reconveyance of the Shelburne property.* An agency differs from other fiduciary relations in the fact that it is the agent's duty to obey the will of the principal, to respond to the principal's wishes, and not to act contrary to the principal's directions. Restatement (Second) of Agency §§ 14, 33, 385. "[I]n no event must [the agent] act contrary to what . . . the principal desires him to do," *id.* § 33 comment a, even if the principal's directions amount to a breach of the agency contract. *Id.* § 118 comment b.

Whether or not Joan's power to act with respect to the Shelburne property had been effectively terminated when she learned of Gagnon's purchase and sale agreement, she remained his agent in all other respects subsequent to December 26, 1991. As such, Joan continued to be subject to the

---

tlor, trustee, or beneficiary, unless those terms expressly recognize a power of termination in such persons. See Restatement (Second) of Agency § 14B & comment a.

[13]The power of attorney did not purport to vest title to Gagnon's property in Joan as agent. "[A]n agent as such does not have title to the property of his principal . . . ." Restatement (Second) of Trusts § 8 comment a (1959). That is one of the chief distinctions between an agent and a trustee. *Ibid.* Restatement (Second) of Agency § 14B comment a.

[14]Even if Joan had sold the Shelburne property pursuant to her power of attorney before Gagnon had contracted to sell it, the proceeds would have been subject to his control and usable entirely and solely for his benefit.

duty to respond to his wishes. Her refusal to reconvey the Shelburne property upon his request in early January, 1992, or to take steps that were within her power to achieve his expressed desire, plainly violated Joan's fiduciary duty of obedience to her principal.[15]

c. *Joan violated her fiduciary duty of loyalty by failing to inform Gagnon of material facts.* An agent's duty to make full disclosure to the principal of all material facts relevant to the agency is a necessary corollary to the fundamental agency obligations of undivided loyalty and utmost good faith. See *Gage* v. *Boston Natl. Bank*, 257 Mass. 449, 452 (1926); *Spritz* v. *Brockton Sav. Bank*, 305 Mass. at 172. As set forth in the Restatement (Second) of Agency § 381, "an agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person." Whenever facts known to the agent but not to the principal may affect the desires and conduct of the principal, the agent must communicate that information to the principal, *id.* § 381 comment a, particularly if the agent is engaging in "any arrangement . . . adverse to the [principal's] interest." *Spritz* v. *Brockton Sav. Bank*, 305 Mass. at 172. See Restatement (Second) of Agency § 390 comment a. In short, an agent, "must be 'upfront' with his principal at all times." *Jerlyn Yacht Sales, Inc.* v. *Wayne R. Roman Yacht Brokerage*, 950 F.2d at 69.

Joan's conveyance of the Shelburne property to an irrevocable trust created and controlled by her alone came at a time when she knew of Gagnon's firm desire to sell the property. Her failure to inform him of her purpose regarding the trust transaction and of its consequences — most notably, its effective elimination of Gagnon's ability to control either the property or the proceeds of its sale — was incompatible with the full and faithful discharge of the disclosure obligation she owed Gagnon. Her breach of duty in this respect was espe-

---

[15]Under the trust, Joan had the discretion to pay the principal (which consisted entirely of the Shelburne property) to Gagnon at any time.

cially objectionable in light of her virtual admission (on cross-examination) that the entire December 26, 1991, arrangement was motivated by an intent to block Gagnon's imminent sale to Cosby.

Even if the conveyance-to-the-trust transaction was, as Joan argues, literally authorized by the power of attorney (but see note 11, *supra*), Joan remained under and violated the duty to disclose all relevant facts that she as agent "should realize would be likely to affect the judgment of the principal in giving his consent to the agent to enter into the particular transaction on the specified terms." Restatement (Second) of Agency § 390 comment a. The existence of the purchase and sale agreement and the fact of this litigation underscore the materiality that advance information about the December 26, 1991, transaction would have had for Gagnon.

d. *Joan violated her fiduciary duty of loyalty by self-dealing.* The upshot of Joan's creation of the trust and conveyance to it of the Shelburne property was that not just title to, but also control over the parcel and its disposition, during and after Gagnon's lifetime, passed from Gagnon to Joan. The transaction also provided her with a remainder interest in the Shelburne property (or its proceeds). Joan thus benefited personally from the transaction in a manner directly opposed to Gagnon's interest and manifested desires.

Such self-dealing by an agent, in the absence (as here) of distinct authority from the principal expressly granted in the empowering instrument, has been continuously and uniformly denounced as one of the most profound breaches of fiduciary duty, irrespective of the agent's good faith and however indirect or circuitous the accomplishment of the benefit to the agent. See *Jennison* v. *Hapgood*, 7 Pick. 1, 7-8 (1828); *Sikes* v. *Inhabitants of Hatfield*, 13 Gray 347, 353 (1859); *American Circular Loom Co.* v. *Wilson*, 198 Mass. 182, 206-207 (1908); *Lindsay* v. *Swift*, 230 Mass. 407, 412 (1918); *Dolbeare* v. *Bowser*, 254 Mass. at 61; *Pitman* v. *Pitman*, 314 Mass. 465, 471, 476 (1943); *Berenson* v. *Nirenstein*, 326 Mass. 285, 288, 289 (1950); *Mackey* v. *Rootes*

*Motors Inc.*, 348 Mass. 464, 467-468 (1965); *O'Brien* v. *Dwight*, 363 Mass. 256, 283-284 (1973). See also *Robertson* v. *Chapman*, 152 U.S. 673, 681-682 (1894); *Estate of Casey* v. *Commissioner of Int. Rev.*, 948 F.2d 895, 898-899 (4th Cir. 1991); *Jerlyn Yacht Sales, Inc.* v. *Wayne R. Roman Yacht Brokerage*, 950 F.2d at 66-67; *Fender* v. *Fender*, 285 S.C. 260, 262 (1985); *Creasy* v. *Henderson*, 210 Va. 744, 749-750 (1970); Restatement (Second) of Agency §§ 34, 39, 387, 388, 389, 391, 394.

The sedulous application and uncompromising rigidity of the prohibition against unauthorized fiduciary self-dealing do not flow merely from the interpretive principle that powers of attorney are to be strictly construed to require explicit, and not inferential, grants of "dangerous" agency authority the exercise of which is potentially destructive of the principal's interests. See, e.g., *Hoyt* v. *Jagues*, 129 Mass. 286, 288 (1880); *Williams* v. *Dugan*, 217 Mass. 526, 529-530 (1914); *Estate of Casey* v. *Commissioner of Int. Rev.*, 948 F.2d at 900; Restatement (Second) of Agency § 34 comment h.[16] The interdiction has been said to be based upon "the highest and truest principles of morality," *Dzuris* v. *Pierce*, 216 Mass. 132, 136 (1913); cf. The Gospel of Matthew 6:24; but it is equally grounded in the law's prudent "[dis]trust [of] human nature [when] exposed to the temptations" inherent in the fiduciary relationship, *Hall* v. *Paine*, 224 Mass. 62, 73 (1916), with the attendant necessity to "protect the weak and incompetent from the encroachments and overreachings of the artful and the powerful." *Arnold* v. *Brown*, 24 Pick. 89, 96-97 (1832). Joan's artful December 26, 1991, transactions so entangled her personal interests with those of her

---

[16]The rule of strict construction "does not go to the extent of destroying the purpose of the power," and the meaning of an unambiguous power of attorney is to be gleaned from "the intent of the parties as manifested by the words used and the object to be accomplished." *MacDonald* v. *Gough*, 326 Mass. 93, 96-97 (1950). This general principle does not advance Joan's position, however, since the object and purpose of her power was to act for Gagnon's benefit and in his stead should he become incapacitated (see discussion *supra*). Neither that purpose nor the terms of the document itself endow Joan with extraordinary agency powers such as the right to reap personal benefit without the principal's consent.

uninformed principal, to her benefit and his detriment, as to justify branding them a breach of her fiduciary obligation of undivided and unselfish loyalty.

4. *Disposition.* Gagnon, as a principal whose agent violated her fiduciary duties, is entitled to a judgment ordering Joan, who stands as constructive trustee for his benefit with respect to the Shelburne property, to reconvey the property to him. See *Jones* v. *Swift*, 300 Mass. 177, 185 (1938); *Lydia E. Pinkham Medicine Co.* v. *Gove*, 303 Mass. 1, 10-11 (1939); *Berenson* v. *Nirenstein*, 326 Mass. at 288-289; *Sanguinetti* v. *Nantucket Constr. Co.*, 5 Mass. App. Ct. 227, 236-237 (1977); Restatement (Second) of Agency §§ 399, 402, 407; Restatement of Restitution § 4(c) & comment d, § 130 & comment a, § 141 & comment a, § 190 & comment a, § 192 & comments a & d, and § 199 (1937).

Accordingly, the judgment entered on October 1, 1993, for the defendants is reversed. The case is remanded to the Superior Court for entry of a new judgment declaring that the plaintiff-appellant, Francis W. Gagnon, is the fee simple owner of the 184-acre Shelburne property; declaring that the defendant Joan Coombs' deed to herself recorded on December 27, 1991, at the Franklin County registry of deeds, book 2596, page 69, is null and void; and directing the defendant Coombs to reconvey the property to Gagnon, to record the deed and a copy of the new judgment in the grantor's index under her name, both individually and as trustee, and to take any other steps, as reasonably requested by Gagnon's attorney at law, which may be necessary to insure that these declarations and Gagnon's restored title are properly reflected on the appropriate records of the Franklin County registry of deeds. (A copy of the new judgment may also be recorded in the Registry by Gagnon or his attorney.) Gagnon's request for appellate legal fees against the defendant Coombs is de-

nied; her resistance to his appeal cannot be characterized as frivolous in light of the decision in her favor below.[17]

*So ordered.*

---

[17]We have considered but rejected Joan's cross appeal, asserting that it was error to allow Gagnon to file his appeal late. The February 3, 1994, notice of appeal was timely filed, following the judge's denial of Gagnon's posttrial motions for a new trial and amended findings and conclusions, pursuant to the lower court's authority under Mass.R.A.P. 4(c), as amended, 378 Mass. 929 (1979). It was, in any event, filed well within the one-year period permitted under Mass.R.A.P. 14(b), 378 Mass. 939 (1979). The egregiousness of the fiduciary violations involved provides ample good cause for acceptance of that filing. See Mass.R.A.P. 2, 365 Mass. 845 (1974).